IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2015

## RAYMOND LEE SWETT, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2009-C-2869      Cheryl A. Blackburn, Judge**

_____

**No. M2014-02243-CCA-R3-PC- Filed September 28, 2015**

_____

The petitioner, Raymond Lee Swett, Jr., appeals the post-conviction court's denial of his petition for relief, arguing he received the ineffective assistance of counsel. After review, we affirm the denial of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

David Harris (on appeal) and Jason Chaffin (at hearing), Nashville, Tennessee, for the appellant, Raymond Lee Swett, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Rachel M. Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted by a Davidson County Criminal Court jury of aggravated burglary, especially aggravated kidnapping, second degree murder, and felony murder, and the trial court imposed an effective sentence of life plus twenty-two years. This court affirmed the petitioner's convictions and sentences on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal.

The underlying facts of the case were recited by this court on direct appeal as follows:

The facts of this case are largely undisputed. Following a drug deal gone awry, the [petitioner] and Calvin Hargrove went to the apartment of Jessica Cain-Beaty, and, while there, the [petitioner] struck Ms. Cain-Beaty repeatedly with a gun while demanding the return of money he believed was owed to him as a result of the drug transaction. After one of Ms. Cain-Beaty's friends gave him the money, the [petitioner] left the apartment and walked toward the exit of the apartment complex. Just before the [petitioner] reached the exit, Jeffrey Beaty, Ms. Cain-Beaty's estranged husband, confronted him. The [petitioner] warned Mr. Beaty with the gun while walking backward toward the exit. When Mr. Beaty continued to advance, the [petitioner] shot him.

At trial, Ms. Cain-Beaty testified that early in the day on May 24, 2009, the [petitioner], whom she knew as Skeet, telephoned her to inquire about purchasing prescription pills from her, and she agreed to give him 10 pills that had a street value of $20 and $20 cash in exchange for $40 worth of powder cocaine. After they struck the deal, the [petitioner] arrived in the parking lot outside her apartment in a vehicle being driven by an individual she did not know. Ms. Cain-Beaty described what happened next:

> I went to the window and I gave him the bottle of pills, the ten pills, and twenty dollars cash. And then I waited for what I thought I was supposed to get and he said he had already . . . given it to me. And I said this . . . isn't right. And I proceeded to grab the twenty off his lap and . . . I went back inside.

She said that instead of $40 worth of powder cocaine, the [petitioner] had given her "just a little tiny crumb of something" that "there wasn't enough to do." She put the cocaine under her bathroom sink. She said that she talked to her friends, Major Drinks and Justin Harmer, "for about five minutes" and that she went into her apartment alone.

Ms. Cain-Beaty testified that approximately five to 10 minutes later, Mr. Drinks and Mr. Harmer returned to the apartment and told her that the [petitioner] and the other man had returned. She said that she "got the door open enough to let" Mr. Harmer inside the apartment, but she was forced to leave Mr. Drinks outside; she shut the door and locked the three locks to prevent the [petitioner]'s entering. Ms. Cain-Beaty testified that when she told the [petitioner] that she was going to telephone the police, the [petitioner] said, "I don't care if you call the cops" and then kicked in the

2

door. The [petitioner], who was armed with a handgun, grabbed Ms. Cain-Beaty by the hair and dragged her into the bathroom, where he hit her in the head with the gun a number of times and kicked her in the head and face "repeatedly." During the beating, the [petitioner] demanded the return of "his twenty dollars." Ms. Cain-Beaty said that the [petitioner] did not give her "any kind of chance to ever get" the money and that she did not have the money because she had originally borrowed it from Mr. Harmer and had returned it to him after the deal soured.

According to Ms. Cain-Beaty, her neighbor, Mikhol Preston, arrived at some point and gave the [petitioner] $20 so that he would leave. She said that the [petitioner] broke her nose with the gun and kicked her in the head before leaving through the broken door. "About thirty seconds after that then the door opened again, but it wasn't them, it was Jeff." Mr. Beaty asked what had happened and where her attacker had gone, and she told Mr. Beaty that "they had guns and they were crazy" and begged him not to go after the men. She said that Mr. Beaty ignored her pleas and left the apartment through the patio door. She eventually managed to gain her feet and walked toward the door of the apartment. Ms. Cain-Beaty testified that before she could get out of the apartment, she heard a single gunshot. She went outside and saw Mr. Beaty lying in the parking lot.

During cross-examination, Ms. Cain-Beaty admitted to heavy drug use around the time of the offenses but denied using drugs on that particular day. She also admitted smoking crack cocaine with the [petitioner] on an earlier occasion but denied having a sexual relationship with him. Ms. Cain-Beaty conceded that she lied to police about her association with the [petitioner] during an initial interview but said that she later disclosed that the attack came on the heels of a botched drug deal.

Major Drinks testified that he was living with Ms. Cain-Beaty at the time of the offenses, but the two were not romantically involved. On May 24, 2009, the [petitioner] called Ms. Cain-Beaty to inquire about purchasing some prescription pills. Mr. Drinks said that he was standing in the breezeway of the apartment building when the [petitioner] arrived in a sport utility vehicle ("SUV") being driven by a person that Mr. Drinks did not recognize. He recalled seeing Ms. Cain-Beaty and Mr. Harmer approach the passenger side window of the SUV and hearing Ms. Cain-Beaty say, "Somebody's trying to beat me, he's trying to beat me." Mr. Drinks said that Ms. Cain-Beaty "snatched" some money from the [petitioner] and walked back toward her apartment.

3

After observing the SUV exit the parking lot, Mr. Drinks walked with Mr. Harmer back to Ms. Cain-Beaty's apartment. Before they reached the apartment, they saw the SUV return. Mr. Drinks said that Mr. Harmer ran to Ms. Cain-Beaty's apartment and shut the door. The driver parked the SUV, and the [petitioner] and another man got out of the SUV armed with guns. The men asked Mr. Drinks where Ms. Cain-Beaty had gone, and he told them that he did not know. The men then pounded on Ms. Cain-Beaty's door, demanded that she open it, and ordered her to return the money. The man with the [petitioner] kicked the door in, and the [petitioner] entered through the broken door. Mr. Drinks walked in behind him. Mr. Drinks said that once inside the apartment, the [petitioner] grabbed Ms. Cain-Beaty and dragged her to the bathroom. Mr. Drinks testified that although he could not see into the bathroom area, he heard Ms. Cain-Beaty screaming and heard the [petitioner]'s companion say, "Why are you beating her like that?" Shortly thereafter, the man told the [petitioner] that he was leaving and left the apartment via the sliding glass door.

Mr. Drinks said that he followed the man out of the apartment and saw the man get into the SUV and leave. He then went to look for Mr. Harmer, whom he had seen leave the apartment just before the [petitioner]'s companion. When he could not find Mr. Harmer, Mr. Drinks walked back toward Ms. Cain-Beaty's apartment. Mr. Drinks testified that as he neared her apartment, he saw Mr. Beaty go into Ms. Cain-Beaty's apartment. The [petitioner], he said, had already exited Ms. Cain-Beaty's apartment and was walking across the parking lot. Shortly thereafter, Mr. Beaty came out of the apartment and asked Mr. Drinks where the [petitioner] had gone. Mr. Drinks said that he pointed the [petitioner] out but warned Mr. Beaty that the [petitioner] was armed. Mr. Drinks said that Mr. Beaty "seemed calm" and that Mr. Beaty claimed that "he wanted to speak with the gentleman in a calm manner." Mr. Drinks testified that he followed Mr. Beaty, who was walking at a "normal pace," from a short distance. Mr. Drinks said that as they approached the [petitioner], the [petitioner] began to back away but told Mr. Beaty, "I got something for you." Mr. Drinks said that when Mr. Beaty was approximately "two or three feet in front of" the [petitioner], the [petitioner] raised his gun and shot Mr. Beaty. After the [petitioner] shot Mr. Beaty, the SUV, which had returned just before the shooting, drove away, and the [petitioner] ran away in the same direction.

4

During cross-examination, Mr. Drinks admitted that he had sold prescription pills for Ms. Cain-Beaty before and that he told police that Ms. Cain-Beaty had been "turning tricks with" the [petitioner] the day before the offenses. Mr. Drinks said that despite the [petitioner]'s warning Mr. Beaty off, Mr. Beaty continued to approach him.

Mikhol Preston testified that at the time of the offenses, she lived in the apartment directly above Ms. Cain-Beaty's. On that day, she heard "a lot of noise coming from outside," so she looked out her window and saw Ms. Cain-Beaty getting out of a black SUV. Ms. Preston said that she returned to what she had been doing, but she went downstairs to investigate when she heard Ms. Cain-Beaty yell several times. She testified that as soon as she got downstairs, Ms. Cain-Beaty rushed her into Ms. Cain-Beaty's apartment and locked the door. The two women went into the bedroom, "and before [they] could even start speaking again, [they] heard a noise[,] and . . . two other gentlemen entered her apartment." Ms. Preston said that the men were armed and that the [petitioner] shouted, "Where is my money, where is my money?" She testified that the [petitioner] then took Ms. Cain-Beaty "by the arm and led her into the bathroom." Ms. Preston said that she heard "a loud smacking noise" followed by Ms. Cain-Beaty's screaming, "Stop, please stop hitting me." She recalled that the [petitioner]'s companion, whom she identified as Calvin Hargrove, shouted for the [petitioner] to "come on," and when the [petitioner] did not respond, the man left. Mr. Drinks and Mr. Harmer left the apartment behind Mr. Hargrove.

At that point, Ms. Preston testified, the [petitioner] dragged Ms. Cain-Beaty back into the living area of the apartment. He hit her again and demanded the return of his money. Ms. Preston said that she asked the [petitioner] how much money was owed to him, and he told her that Ms. Cain-Beaty owed him $20. Ms. Preston said that she got $20 from her own purse and gave it to the [petitioner]. The [petitioner] struck Ms. Cain-Beaty "a few more times and kicked her" before he left the apartment.

Ms. Preston testified that she got her purse and attempted to leave when Ms. Cain-Beaty asked her to record the license tag number of the SUV. Ms. Preston said that although she agreed, she "wasn't going to go out there and get the license plates" because she "was too scared." When she exited the apartment, she saw Mr. Beaty running toward Ms. Cain-Beaty's apartment. After Mr. Beaty went inside the apartment, Ms. Preston

5

went to a neighbor's house and knocked on the door until someone let her inside.

Metropolitan Nashville ("Metro") Police Depar[t]ment Officer Ashley Kendall Coon responded to the call of a shooting at the Pagoda Apartment Complex at approximately 11:00 p.m. on May 24, 2009. When Officer Coon arrived at the complex, he observed Mr. Beaty's body lying "roughly thirty feet" from the front of the apartment complex. Ms. Cain-Beaty was near the body, and "she appeared to be cut up, looked to have been beat on." He said that "she was basically just in a basic state of hysteria" and that, as a result, he was unable to get any information from her. He called an ambulance and tried to obtain information from other witnesses at the scene.

Metro Officer Carroll Fondaw testified that he assisted in setting up the crime scene and that he requested and reviewed surveillance video recorded from the Walmart located across the street from the Pagoda Apartments. He said that video cameras recorded a dark SUV pull into the Pagoda apartments at 10:53 p.m. The same vehicle exited the apartment complex at 11:00 p.m. and returned at 11:08 p.m. The vehicle again exited the complex at 11:12 p.m. and returned at 11:14 p.m. The video then showed an individual running out of the apartment complex toward the Walmart approximately 30 seconds later. The SUV "followed, stopped briefly and then that subject got into that vehicle and then it appear[e]d as though that dark colored SUV continued east on Welch."

Jennifer Grubbs, an investigator with the medical examiner's office, testified that she responded to the Pagoda Apartments and pronounced Mr. Beaty dead at 2:20 a.m. She recalled that Mr. Beaty had "a black single drop blade knife" in his "right rear pocket" at the time he died. Ms. Grubbs removed the knife, along with Mr. Beaty's other personal possessions, and photographed them at the scene.

Shameka Saffold, custodian of records for Cricket Communications, testified that cellular telephone records showed that several calls were placed from a cellular telephone registered in the [petitioner]'s name to a cellular telephone registered in Ms. Cain-Beaty's name on May 24, 2009, in the hours leading up to the offenses. The last call was placed at 11:05 p.m. A call was placed to 9-1-1 from Ms. Cain-Beaty's cellular telephone at 11:10 p.m.

6

Maxwell Alexander Delancy testified that on May 24, 2009, he was at Mr. Hargrove's house "conversating, hanging out" when the [petitioner] arrived and spoke to Mr. Hargrove "about some sort of drug deal he had for Hargrove." Mr. Delancy heard the [petitioner] tell Mr. Hargrove that the [petitioner] had "a lady down there who has $20 and will give you $20 worth of some type of pills for $40 of crack." Mr. Delancy said that Mr. Hargrove asked him to drive the [petitioner] to make the transaction and that he agreed because he owed Mr. Hargrove money. Mr. Delancy testified that the [petitioner] directed him to the Pagoda Apartments and that when he pulled into a parking space, "[t]he white lady that [he] had seen came to the car, just directly to the car." He described what happened next:

> And they're conversating and she shows him – she gives him $20 already. And she gives him $20, he has the crack in his hand. As he's about to show her the crack, . . she's opening up a pill bottle as well while he's about to open up . . . his hand. He's opening up his hand; she sees it. And she looks at it for a second; pauses and looks at it. And then she goes on. . . . No, no. You're not . . . about to get me. You're not about to get me. No. No. No. Just carrying on and pretty much just takes everything out of Swett's hand including her pills, including that $20 and the crack, and walks off.

After Ms. Cain-Beaty walked away, Mr. Delancy "threw [the] car in reverse and started driving." He said that he told the [petitioner] that the [petitioner] would be responsible for telling Mr. Hargrove what had happened. Mr. Delancy testified that the [petitioner] said that he "didn't give a f* * * that he got stolen from and he don't give a f* * * about what Hargrove thinks."

Mr. Delancy said that he drove directly to Mr. Hargrove's residence. Once there, the [petitioner] went inside first and told Mr. Hargrove what happened. Mr. Delancy recalled that Mr. Hargrove came to Mr. Delancy and told him that the [petitioner] wanted Mr. Hargrove to provide him with drugs for setting up the deal with Ms. Cain-Beaty even though the deal went sour. Mr. Hargrove then asked Mr. Delancy to return him to the apartments to get his money back. Mr. Delancy said that he did not want to do so, and the two argued. At that point, Mr. Hargrove called in the debt that Mr. Delancy owed. Mr. Delancy testified that because he did not have

7

the money to repay the debt, he agreed to take Mr. Hargrove and the [petitioner] back to the Pagoda Apartments.

Mr. Delancy said that during the drive to the apartments, the [petitioner] was "in the back pissed off that Jessica even got over on him on this situation. And he's throwing himself everywhere around the car, and making a big scene in the car. Yeah, man; screaming, you know, I'm going to f* * * this b* * * * up. She doesn't know me. She doesn't know who I am." Mr. Delancy testified that Mr. Hargrove told the [petitioner] to "calm the f* * * down, chill the f* * * out, you're not going to do anything, just calm down." When they arrived at the apartments, Mr. Hargrove told the [petitioner] to call Ms. Cain-Beaty, but the [petitioner] was unable to do so, so the two men got out of the car and walked to the apartment. Mr. Delancy testified that "seven to ten minutes" passed before he saw someone come out of the sliding glass door and travel "straight up to another path of stairs." He then saw Mr. Hargrove stick his head out the sliding glass door, glance both ways, and then go back inside for "like 5, 10 seconds" before returning to Mr. Delancy's vehicle. When Mr. Hargrove got inside the vehicle, he told Mr. Delancy that the [petitioner] was in the apartment "beating her." Mr. Delancy said that he told Mr. Hargrove to "go get him, he's going to kill somebody; go get his a* *." Mr. Hargrove instead ordered Mr. Delancy to leave.

Mr. Delancy testified that he complied with the order and drove away. When they reached "the top of Welch Road," Mr. Hargrove "pull[ed] out a gun and thr[e]w it underneath the seat." At that point, Mr. Hargrove told Mr. Delancy to turn around and go back to the apartment to get the [petitioner] because "he's going to kill somebody." Mr. Delancy said that when they pulled into the parking lot, he saw "two individuals on down inside the apartments along where the cars are parked and one other individual and Swett. The one individual is walking up on Swett, walking towards Swett. Swett keeps backing up; walking up on him." Mr. Delancy said that he pulled "right next to both of them," and Mr. Hargrove told the [petitioner] to "quit f* * *ing around, get in the car." The [petitioner] backed away and the other individual kept walking toward him. Mr. Delancy rolled the car forward to the point where both individuals were behind it. At that point, the [petitioner] shot the other individual.

Mr. Delancy testified that when he pulled out of the apartment complex, he "almost hit" the [petitioner], so he "slow[ed] down from snagging [the petitioner] and [the petitioner] opened [the] car door and gets

8

in the car." The three returned to Mr. Hargrove's house, and Mr. Hargrove removed the gun from Mr. Delancy's car. Mr. Delancy said that he spoke briefly with Mr. Hargrove's mother and then left.

Mr. Delancy recalled that at some later date, Mr. Hargrove called Mr. Delancy and said, "[Y]ou need to come over to my house and you need to get this story together so what I said to the detectives and what you're going to say to the detectives hopefully coincides together and doesn't make it look like he was leaving anything out of his story." According to Mr. Delancy, Mr. Hargrove also told Mr. Delancy to tell police that they did not pick the [petitioner] up after the shooting.

During cross-examination, Mr. Delancy admitted that he lied to police in his first two statements and only changed his story one month before the [petitioner]'s case was scheduled to go to trial. Mr. Delancy described the [petitioner] as "a crack head" whom he had never seen with a gun before.

Associate medical examiner Adele Lewis, who did not perform the autopsy of Mr. Beaty, reported the conclusions of her colleague.[1] According to Doctor Lewis, Mr. Beaty suffered a single "gunshot wound on the left side of the upper part of the chest" that "struck the major blood vessel . . . from the heart to the rest of the body that's called the aorta. Then it hit the heart itself. Then it injured the major blood vessel that carries blood in the body to the lungs called the pulmonary trunk." The bullet "injured both lobes of the left lung; caused a bruise of the right lung. Again injured the major blood vessel that carries blood to the rest of the body lower down in its course" before it "exited partially through the . . . back." She testified that the wound would have caused death "within a matter of minutes." Based upon the absence of tattooing or soot on Mr. Beaty's clothing or skin, she determined that the fatal shot was fired from greater than three feet.

The State rested, and co-defendant Calvin Hargrove testified on his own behalf. Mr. Hargrove, who was 18 years old at the time of the offenses, testified that the [petitioner] was a friend of his mother's and that he had known Mr. Delancy since they attended school together. He said that on May 24, 2009, the [petitioner] came to him seeking $20 worth of

---

[1] The [petitioner] did not challenge the propriety of Doctor Lewis' testifying about the contents of her colleague's report. See State v. James Drew Freeman, Jr., No. M2011-00184-CCA-R3-CD (Tenn. Crim. App., Nashville, May 9, 2012).

cocaine. Mr. Hargrove stated that he gave the cocaine to the [petitioner], and the [petitioner] paid him for the drugs. He denied any knowledge that the [petitioner] and Mr. Delancy were going to meet with Ms. Cain-Beaty for a drug deal. He testified that Mr. Delancy arrived at his house at approximately 10:45 p.m., and the three men left ten minutes later to travel to Mr. Hargrove's girlfriend's house. Mr. Hargrove said that he was surprised when Mr. Delancy traveled to the Pagoda Apartments.

Mr. Hargove testified that when they arrived at the Pagoda apartments, the [petitioner] went to Ms. Cain-Beaty's apartment. He said that he did not see the [petitioner] in possession of a gun. Mr. Hargrove insisted that he stayed in the vehicle with Mr. Delancy until he "heard screaming and hollering." At that point, he said, he went to investigate and saw the [petitioner] inside the apartment "beating" Ms. Cain-Beaty. He said that he told the [petitioner] to stop and then left. Mr. Hargrove admitted that he had a gun in his pocket and that he placed his hand in his pocket, but he could not be sure whether others saw the gun.

Mr. Hargrove testified that when he returned to the SUV, he told Mr. Delancy to leave. Soon after they left, Mr. Delancy expressed a desire to go back to the apartment complex to "see what was going on." When they pulled into the parking lot, Mr. Hargrove saw the [petitioner] walking and "three other people coming toward him." Mr. Hargrove described what happened next: "And that's when Skeet had turned around and they kept approaching him. Then the other two guys, they kind of stayed back. And the other guy kept coming closer." He said that the [petitioner] started "kind of walking backwards." The two men were yelling at one another. Mr. Hargrove testified that he did not see the actual shooting because the men moved behind the SUV.

The [petitioner] testified that at the time of the offenses, he did not have a job and was "strung out because [he] was getting drunk and high every day." He stated that he first met Ms. Cain-Beaty approximately one week before the offenses and that he told her that he "would trade some dope for sex" and that she agreed. He said that they both used drugs, had sex, and exchanged phone numbers before he left. "[A] couple of days" later, he called her, and the two used drugs together again but did not have sex. On May 24, 2009, the [petitioner] saw Ms. Cain-Beaty as he was walking through the apartment complex, and she asked if he would trade her cocaine for her pills. The [petitioner] said that when he told her he didn't think that would work, she offered to sell the pills for cash. The

10

[petitioner] testified that he told Ms. Cain-Beaty that he was not interested in buying them, but he would try to find a buyer for her. Eventually, Ms. Cain-Beaty told him that she did not want to sell her pills but wanted to trade them for crack. He said that they finally agreed that Ms. Cain-Beaty would give the [petitioner] 10-12 pills plus $20 cash in exchange for $40 worth of crack cocaine. The [petitioner] said that he "got ahold of some people for her and set the deal up" and then traveled to the apartment complex with Mr. Delancy. The [petitioner] said that he was to get "a little bump" of cocaine for his personal use as payment for his setting up the transaction.

According to the [petitioner], when they arrived at the apartment complex, he showed Ms. Cain-Beaty the cocaine, and she gave him the money and the pills. At that point, she said, "[O]h, no, man, f* * * that" and "[s]natched everything out of [his] hand." The [petitioner] testified that Mr. Delancy told him that they needed to "tell [Mr. Hargrove] what the f* * * went down," so they returned to Mr. Hargrove's house. After some conversation, the three men decided to return to Ms. Cain-Beaty's apartment to "discuss it." The [petitioner] said that he believed that Ms. Cain-Beaty probably wanted him to give her more cocaine.

The [petitioner] testified that when they arrived at Ms. Cain-Beaty's apartment, Mr. Hargrove refused to let the [petitioner] go into the apartment alone, and Mr. Delancy encouraged the [petitioner] to go armed and provided the gun. The [petitioner] said that he held the gun in his hand rather than putting it in his pocket because he was "not really familiar with guns." He knocked on the door, but no one answered. The [petitioner] said that he stepped over to the sliding glass door of the apartment but "[b]efore [he] got around the bushes, the door was kicked in." He claimed that he did not intend to frighten Ms. Cain-Beaty. The [petitioner] denied kicking in the door but admitted that he entered the apartment through the fallen door and walked directly to Ms. Cain-Beaty. He said that he demanded the return of his money, and Ms. Cain-Beaty, who "had a little thing tied around her arm," "looked like she was surprised." He said that when he demanded the return of his money a second time, Ms. Cain-Beaty feigned surprise and told him to "get the f* * * out of here." The [petitioner] acknowledged that at that point, he struck her with the gun, and she fell to the floor with her head in the bathroom. He denied that Ms. Cain-Beaty had her cellular telephone in her hand during the encounter. Instead, he said, she had a syringe in one hand. He said that he again demanded the

11

money and admitted that he struck Ms. Cain-Beaty again after "she gave the ol' glare, you know, just get the f* * * out of my face."

The [petitioner] testified that he believed that he struck Ms. Cain-Beaty "four or five times" and that he stopped hitting her when he "raised up and . . . seen all that blood." When he turned around, Ms. Preston gave him $20, and he left. He said that he did not ask Ms. Preston for money. Nevertheless, he "put it in [his] pocket and walked out the front door." When he got outside, he saw that Mr. Delancy was gone. He said that he walked away "not running but . . . . trying to get out of there."

According to the [petitioner], as he walked across the parking lot, he heard someone say "hey, mother f* * * * * " like they knew him, but he did not turn around. When he heard it a second time, he "turned around and looked and it was this dude running up on" him. He said that he told the man to back off, but the man kept "coming with his hand behind his back." When the man got closer, he said, "Yeah, n* * * * *, I got your a* * now. I'm going to kill you. I got you." The [petitioner] said that he kept backing away in an attempt to reach the street so that he could run away. The [petitioner] testified that he was frightened and believed the man intended to kill him. At that point, the [petitioner] raised his gun and fired a single shot. He insisted that he did not aim the gun at Mr. Beaty. The [petitioner] said that after firing the shot, he "took off running" and got into the SUV driven by Mr. Delancy as it pulled into the apartment complex.

The [petitioner] insisted that he did not know he had killed Mr. Beaty. He admitted that he never saw Mr. Beaty in possession of a weapon but maintained that he believed, based upon Mr. Beaty's carriage and demeanor, that he was armed.

During cross-examination, the [petitioner] testified that he made it almost to the apartment complex entrance before being confronted by Mr. Beaty. He claimed he could barely recall his interview with the police on the day after the shooting and that he could not recall in any detail what he said. He admitted that he had lied because he was "drunk and high" and that he did not tell police that he shot Mr. Beaty in self-defense.

State v. Raymond Lee Swett, Jr., No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at *1-9 (Tenn. Crim. App. Jan. 4, 2013), perm. app. denied (Tenn. May 9, 2013).

The petitioner filed a timely *pro se* petition for post-conviction relief and, following the appointment of counsel, an amended petition was filed. In his petitions, the petitioner raised numerous allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that he was initially represented by a public defender, who conducted the preliminary hearing, but then his father retained trial counsel to represent him. The petitioner stated that counsel visited him only once or twice in jail and when his case was on the court docket. He said that counsel did not convey or discuss any settlement offer with him, although his original attorney had. He never mentioned the settlement offer that his original attorney received to counsel. The petitioner stated that his original attorney provided him a copy of the discovery from the State, and he provided a copy of the same to counsel. However, counsel never reviewed any of the discovery with him. The petitioner claimed that he and counsel never had any meaningful discussions about the case and that she told him "don't worry, . . . she's going to handle it." The petitioner also claimed that counsel never told him what potential punishments each charge carried, and he never asked because he "was trusting her to . . . defend [his] life."

The petitioner testified that, before trial, counsel never discussed the State's witness list with him, how those witnesses would possibly testify, what the State's proof against him would be, or what their theory of defense would be. The petitioner told counsel his version of the events the first time he met her. However, counsel never talked with him about how he was going to present his version of events to the jury or whether he was going to testify and what that would entail. It was only during the trial, after the State's witnesses had testified, that he told counsel he needed to testify to tell his side of the story, and they discussed his testifying while sitting side by side in the courtroom.

The petitioner testified that he asked counsel whether she had been in contact with any potential witnesses who were at the apartment complex at the time of the shooting and saw a man come up to him. He said that counsel told him that she was trying to locate some people and "just be calm, just be cool." However, the petitioner admitted that he did not give counsel any specific names of people to contact, explaining, "I was just wanting her to talk to anybody that was in that vicinity. I didn't have no specific names . . . it's people that hangs out in the apartments."

The petitioner testified that counsel never explained to him that he would be subject to cross-examination if he testified. Counsel also did not prepare him for what hers or the State's questions might be. As a result, he was caught off guard and unprepared for many of the questions asked of him. The petitioner also testified that, at one point, counsel referenced a "motor vehicle burglary," which perplexed him because he was charged with aggravated burglary and there was no mention of a motor vehicle in the indictment or facts. He stated that counsel never discussed any pretrial motions that

13

they could file. He felt that counsel was generally unprepared to handle his case. He elaborated that she mentioned during the trial that the indictment had some type of error in it, but he maintained that counsel should have prepared to defend him "instead of going in trying to . . . use an indictment issue as being wrong."

The petitioner testified that counsel was also ineffective in the handling of his appeal. He said that counsel had to supplement the record twice in order to appeal one of his issues. However, she promised the court a supplemental brief addressing that issue but never filed one, which the court noted in its opinion. As a result, one of his issues was not reviewed.

Trial counsel testified that, after she was retained to represent the petitioner, she went to see him and they discussed the case and plea offer from the State, possible defenses, and a possible counter-offer. Counsel thought that there might be self-defense issues in the case and that the State might agree to a counter-offer of fifteen years. She discussed the potential for a counter-offer with the petitioner, but "he didn't want the fifteen." Counsel said that she discussed the petitioner's charges with him, his range of punishment on each charge, and his exposure if found guilty. She said that she "went over everything with him. . . . I don't know what . . . I could have left out."

Counsel testified that she had a copy of the discovery, and she talked to the petitioner about what the State's proof might be at a trial. She discussed who the State's witnesses might be with the petitioner, and she interviewed witnesses. She recalled talking on the phone to Major Drinks, who had observed the apartment door being kicked in. She also personally interviewed a woman, possibly named "Mindy," who lived in the apartment complex.

Counsel testified that she could not recall the exact number of times she visited the petitioner in the jail, but she thought that twelve times sounded accurate. She remembered that the visits were "thorough visits." Counsel recalled that the petitioner's position throughout was that he acted in self-defense and that was their only defense at trial.

Counsel stated that she discussed the petitioner's testifying with him and recalled telling him, "[I]f you testify as a self-defense you're going to have to make it clear." However, counsel said that she regretted not discussing "courtroom etiquette [with the petitioner] a little bit more," elaborating that she was "shocked at some of the language" the petitioner used on the stand.

Counsel testified that she recalled arguing that the petitioner's actions with regard to the first part of the incident did not constitute kidnapping. She did not recall if she

"argued hard much on the aggravated burglary . . . [and] may have even conceded as much." However, counsel maintained that she argued any facts that were in dispute. Counsel explained that her legal strategy was that she thought she could get a judgment of acquittal on the felony murder charge because the indictment indicated that the underlying felony was burglary, which she believed the State did not prove.

Counsel testified that, with regard to the appeal, she filed for an extension of time because she did not have the entire record. She filed a brief but asked the court of criminal appeals "to allow [her] time to file a supplemental brief pursuant to the supplemental record being filed." However, she decided not to file a supplemental brief because she "had covered all [her] issues basically in the initial brief that [she] needed to. And having received the supplement[al] briefs there was no new issue that needed to be raised." She said that she "just asked for permission in case [she] did need to [file one]."

Counsel testified she "vigorously" argued in her closing argument that the incident which occurred in the apartment was separate and distinct from the self-defense shooting outside near the exit of the apartment complex as a way to show that the State failed to prove felony murder. Counsel noted that she won an acquittal for the petitioner on three counts of especially aggravated kidnapping and on the charge of the attempted first degree murder of Ms. Cain-Beaty. Based on her experience, she did not think the State could prove a premeditated murder, and the jury found that it did not given it convicted the petitioner of the lesser-included offense of second degree murder.

Following the conclusion of the hearing, the post-conviction court entered an order denying relief. The court found that the petitioner failed to establish by clear and convincing evidence that trial counsel was ineffective or that he was prejudiced by any alleged deficiency.

## ANALYSIS

On appeal, the petitioner raises a myriad of complaints in counsel's performance. Specifically, he asserts that counsel: (1) did not convey or discuss a settlement offer, (2) did not discuss the material in the State's response to discovery, (3) did not explain the possible punishment or exposure he faced on his charges, (4) did not discuss a strategy of defense or possible witness testimony, (5) did not prepare him to testify at trial, (6) was unprepared for trial, (7) failed to attack the underlying aggravated burglary charge, (8) "fumbled and stumbled through the essential record preparation and transmittal phase of the appeal," and (9) failed to support the issue of constructive amendment of the indictment in the appellate brief.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is

16

satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Again, the petitioner asserts that counsel rendered ineffective assistance at trial in that she: did not convey or discuss a settlement offer, did not discuss the material in the State's response to discovery, did not explain the possible punishment or exposure he faced on his charges, did not discuss a strategy of defense or possible witness testimony, did not prepare him to testify at trial, and was unprepared for trial. Counsel testified she discussed the case and plea offer from the State with the petitioner, as well as possible defenses, the charges against him, the range of punishment on each charge, and the petitioner's exposure if found guilty. Counsel testified that she had a copy of the discovery, and she talked to the petitioner about what the State's proof might be at a trial. She discussed who the State's witnesses might be with the petitioner, and she interviewed witnesses. Counsel recalled that the petitioner's position throughout was that he acted in self-defense and that was their only defense at trial. Counsel said that she discussed the petitioner's testifying with him even though she regretted not discussing "courtroom etiquette [with the petitioner] a little bit more," elaborating that she was "shocked at some of the language" the petitioner used on the stand. The post-conviction court accredited counsel's testimony as to these issues. Accordingly, the petitioner has failed to prove that counsel performed deficiently in these regards.

The petitioner also asserts that counsel rendered ineffective assistance at trial by failing to attack his underlying aggravated burglary charge because "[h]ad the aggravated burglary been defeated on the elements, there would not have been a conviction for felony murder." However, counsel explained that her legal strategy was that she thought she could get a judgment of acquittal on the felony murder charge because the indictment indicated that the underlying felony was burglary, not aggravated burglary, and she believed the State did not prove "just regular burglary." She elaborated, "I'[ve] tried murder trials. I know they know how to use aggravated burglary if that's what they mean, and they use burglary when that's what they mean." She believed the State's wording to be intentional and in reference to some other alleged act of burglary rather than that in count one. Counsel testified that she did not recall if she "argued hard much"

17

on the aggravated burglary charged in count one because she believed that it would likely stand, but she maintained that she argued any facts that were in dispute. We cannot conclude that counsel rendered deficient performance because she made an informed strategy in how to try to defeat the most serious charge against the petitioner, although in hindsight such strategy was unsuccessful.

The petitioner asserts that counsel rendered ineffective assistance on appeal in that she "fumbled and stumbled through the essential record preparation and transmittal phase of the appeal," and failed to support the issue of constructive amendment of the indictment in the appellate brief. He relies on a footnote in this court's opinion on direct appeal in which this court observed that the record originally transmitted to the court was in "complete disarray." Raymond Lee Swett, Jr., 2013 WL 53993, at *16 n.3. He also points to this court's noting that he failed to support his constructive amendment of the indictment issue with argument, citation to the record, or citation to relevant authorities, which waived the issue. Counsel testified that she filed for an extension of time because she did not have the entire record. She filed a brief but asked this court "to allow [her] time to file a supplemental brief pursuant to the supplemental record being filed." However, she ultimately decided not to file a supplemental brief because she "had covered all [her] issues basically in the initial brief that [she] needed to and having received the supplement[al] briefs there was no new issue that needed to be raised." Upon review, we conclude that the petitioner cannot prove that he was prejudiced by any of counsel's alleged deficiencies on appeal because this court nonetheless addressed all of his issues, including the constructive amendment of the indictment issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE